OPINION OF THE COURT
David B. Saxe, J.
The outcome of a trial often rests upon the ability of a party or witness to express himself to a jury. Words often trigger *778 powerful visual images and consequently, they act to persuade a court or jury. And, since words are the basic components of communication, the manner in which they are spoken and understood is basic to a fair trial.
Where the language spoken by a party or witness is not English but a foreign language, a court has the power and authority to appoint an interpreter (Wise v Short, 181 NC 320, 107 SE 134 [Sup Ct 1921]). This is so because inherent in the nature of justice is the notion that those involved in litigation should understand and be understood.
Problems of communication may exist however where although both party/witness and interpreter speak the same language they employ different dialects. For example consider a situation where a party/witness converses in a dialect which is often referred to as to New York City Spanish. This dialect differs from formal Spanish in that it contains many words that are derived from English (Nash, Spanglish, Language Contact in Puerto Rico, 4 Am Speech 223). As a result, the English translation may be different from the actual testimony.
In this case, a Spanish-speaking woman sued for injuries she sustained as a result of a fall when a subway car in which she was a passenger stopped suddenly. At the plaintiff’s request, a Spanish interpreter was provided.
The first problem at trial arose when the plaintiff’s counsel asked the plaintiff to compare the velocity of the train’s stop at the time when the plaintiff was injured to other stops that day. The answer communicated to the jury, as translated by the interpreter, was that the train stopped suddenly as if it had bumped into something. A juror who spoke Spanish and who said he was familiar with the dialect spoken by the plaintiff, believed that what the plaintiff meant was not that it felt as if the train bumped into something, but rather that the train "crashed” into something. The juror’s view was made known to me during a recess in the trial when he passed a note to the court officer seeking permission to confer with me on this matter.
In chambers, the juror, with interpreter, court reporter, and counsel present brought his view to my attention. The juror explained that the verb "chocar” which translates into English as to bump, was used by the plaintiff to mean to crash. He grounded this view on the fact that in the dialect of Spanish spoken by the plaintiff, a Puerto Rican woman, the *779 verb "bompiar” means to bump; and, had that been the verb with which she intended to describe the incident, it would have been used. The juror therefore claimed that the witness’s answer was not correctly understood by the jury. The manner in which the train stopped was concededly important to a determination of liability.
The initial question before me concerned whether or not the passing of the note by the juror seeking to advise me on this matter prejudiced the jury panel because it placed the juror in the position of being a "witness” for the plaintiff. The appropriateness of declaring a mistrial was discussed.
According to CPLR 4011, the trial court has the authority to "regulate the conduct of the trial in order to achieve a speedy and unprejudiced disposition of the matters at issue”. This statutory provision simply confirms the expansive common-law powers of New York Judges over conduct in their own courtrooms. A trial court is granted wide latitude in controlling the conduct of a trial (Roma v Blaustein, 44 AD2d 576 [2d Dept 1974]). A mistrial however should not be ordered except to prevent a substantial possibility of injustice (Halstead v Sanky, 48 Misc 2d 586 [Sup Ct, Kings County 1965]).
There are some instances where the conduct of jurors during the trial prevents the defendant from having a trial by a fair and impartial jury. (People v De Lucia, 20 NY2d 275 [1967].) One such instance is when a juror visits the scene of the crime or accident and reenacts the purported criminal acts. (People v De Lucia, supra.) Such actions are inherently prejudicial to the defendant and will automatically warrant a new trial. Similarly, failure to answer a question correctly during voir dire warrants a new trial where it is demonstrated that the juror intentionally concealed facts, bias or prejudice that would render the prospective juror disqualified ab initio from service. (People v Leonti, 262 NY 256 [1933]; Holland v Blake, 38 AD2d 344 [3d Dept], affd 31 NY2d 734 [1972].)
In this case, I determined that the actions of the juror raised little possibility that either he had forfeited his impartiality or that the entire panel was prejudiced. I determined that the juror had not spoken to any other jurors concerning the matter nor did the jurors have any idea why this juror requested to speak with me. During the hearing, the juror was asked whether he would be able to cope with a situation in which his knowledge of Spanish would lead him to a different understanding of the parties’/witnesses’ statement than that *780 of the interpreter’s. His response was that he would be able to deal with such a situation if it arose; however, if there was a large discrepancy, he would bring it to my attention. He reassured me that for the remainder of the trial he would be capable of and willing to rely solely on the interpreter’s words rather than on his own knowledge of the language. Accordingly, I determined that no bias or prejudice existed (People v Rentz, 105 AD2d 920) and that there would be no impediment to proceeding with trial.
When the trial resumed, the plaintiff was recalled to the witness stand and questioned about the force of the crash. As it turned out, the plaintiff meant to convey, by her use of the word chocar, a crash and not a bump.
Perhaps more important than the trial practice issue raised here is the extent to which an interpreter is obligated to interpret the dialect of the language spoken by party or a witness.
In New York County, Supreme Court, Civil Branch, where there is a relatively large Spanish-speaking population, there are four Spanish interpreters employed on a full-time basis. A qualified interpreter must have a minimum of a high school diploma or equivalent. They are hired by the State only after passing a rigorous examination which tests skills in translating Spanish to English and vice versa. The test does not incorporate the usage of any form of Spanish dialect. So, any knowledge an interpreter may have of a particular Spanish dialect is through personal experience or study.
An understanding of the nature of the Spanish dialect spoken by the plaintiff is crucial to an appreciation of the complexity of this issue. New York City Spanish, is characterized by intimate borrowing which occurs when two languages are spoken in what is topographically and politically a single community. In the case of New York City Spanish, Spanish, the minority language is in contact and hence borrows from English, the majority language or the language of the group in the contact situation which has political, economic, and social power. (See, Daiuta, Remarks on Calquing, an unpublished study of Graduate School and Univ Center, CUNY and Queens Coll Dept of Linguistics, at 3.) A result of this language borrowing is the substantial number of New York City Puerto Ricans who speak this hybrid variety of language, which is often given the slightly derogatory label of "Spanglish”.
*781 Certainly, there are some who do not speak New York City Spanish. The Spanish of the newly arrived immigrant will exhibit only as much English influence as exists in his native country. And, there are speakers who, for whatever reason, tend to resist influence from another language. With these exceptions, it is hard to believe that a Spanish speaker who has spent any length of time in New York City will not exhibit features of the contact variety in his speech. (Id., at 10.)
The plaintiff here, it seems, spoke "Spanglish”, which is the vocabulary derived from the practical everyday living and working in a two-language world where fluent command of those languages is rare. (Nash, op. cit, at 223-233.) Verbs in New York City Spanish are formed by taking on the productive infinitive suffixes — ar, ear, and iar. The creation of the verb bompiar is such an example and reflects the activity of everyday life.
The significance of this distinctive "Spanglish” speaking group stems from their large number in New York City, their often low socio-economic status and their shared cultural background. (Chavez, Striving But Still Lagging: Puerto Ricans Wonder Why, New York Times, June 5, 1986, at B 1.) It is all the more imperative therefore that a court be scrupulously concerned with affording this minority group every aspect of a fair trial.
The question raised is whether courts have closed their doors to many New York City Spanish-speaking individuals by providing inadequate interpreters. In any trial where an interpreter’s services are required, the party/witness, at the outset, is placed at a disadvantage. Much of the impact and demeanor of the party/witness becomes obscured by the presence of an interpreter. The jury’s attention tends to become transfixed on the interpreter, an unexpressive participant in the trial.
English is a very expansive and expressive language and an interpreter may at times have to make a choice between two or more words which are similar in definition. An interpreter tries not to put words in the most emphatic way unless absolutely required. Inevitably, due to the spontaneity of an interpreter’s translation, or the lack of an exact translation of a word, it is possible that the interpreter may not choose the best word possible, thus causing a deviation in the intended communication to the jury. However, the use of a specific *782 word can have a significant impact on what is being communicated.
The literature dealing with New York City Spanish suggests that there are a large number of words that have become part of this native dialect. (See generally, Daiuta, op. cit.) One example of this is adoption of the word "bompiar”. To the extent that these words have shades of meaning different from the more traditional Spanish words from which they are derived, translation that does not reflect these changes in language-use results, in many instances, in prejudice to these Spanish-speaking individuals.
Spanish-speaking individuals who speak and understand New York City Spanish are frequent litigants in the Housing Court and other lower courts in the city. Fairness dictates that there is a need for assuring that interpreters of the Spanish language have an understanding and appreciation of the growth and scope of New York City Spanish. It is suggested that the Office of Court Administration develop guidelines for the hiring of interpreters which reflect the spirit of this decision.